### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

COALITION FOR PARITY, INC.      )
     )
     )
       Plaintiff,      )    No. _____
   v.      )
     )
KATHLEEN SEBELIUS, *et al.*,      )
     )
       Defendants.      )
     )

### MEMORANDUM IN SUPPORT OF PLAINTIFF'S
### APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
### <u>MOTION FOR PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................4

    A.    The Coalition. ..................................................................................4

    B.    Congress Enacts The Parity Statute. ...........................................7

    C.    The Coalition Members Seek To Comply With The Statute And Apply Parity To Quantitative Benefits. ..........................................9

    D.    The Departments Wait Six Months And Then Merely Issue A Request for Information. .....................................................................10

    E.    The Departments Issue The IFR Without Notice And Comment. ..........10

    F.    The IFR Would Effect Far-Reaching Changes Not Contemplated By The MHPAEA. .....................................................................11

    G.    The Departments Acknowledge That Their Examples Of Nonquantitative Limitations Do Not Reflect Reality. ..................................14

APPLICABLE STANDARD ...........................................................................15

ARGUMENT ...................................................................................................15

    I.    THE COALITION IS LIKELY TO SUCCEED ON THE MERITS. ..................15

            A.    The APA's Notice-and-Comment Requirements Serve An Important Due Process Function That Cannot Be Ignored. ..................16

            B.    The So-Called "Good Cause" Exception Invoked By Defendants Does Not Apply In This Case. ..................................................18

            C.    The "Interim" Status Of The Rules Is Irrelevant To The Procedural Impropriety Of Their Promulgation. ..........................................21

    II.    THE COALITION'S MEMBERS WILL BE IRREPARABLY HARMED IF THE TRO IS NOT ISSUED. ..........................................................23

            A.    The Coalition Members Will Be Irreparably Harmed By The Single Deductible Requirement. ..........................................................25

            B.    Compliance With The IFR's Novel And Confusing Nonquantitative Limitations Requirements Affects Utilization Management And Patient Care. ..........................................................27

C.    The IFR Threatens The Coalition Members' Ability To Maintain Competitive And High Quality Provider Networks....................................29

D.    The Ill-Informed Nature Of The IFR Precludes Complete And Timely Compliance.................................................................................31

III.    ON BALANCE, THE EQUITIES FAVOR GRANTING THE TRO AND PRELIMINARY INJUNCTION. ..........................................................................34

IV.    A TRO AND INJUNCTION ARE IN THE PUBLIC INTEREST. .......................35

CONCLUSION.......................................................................................................................36

# TABLE OF AUTHORITIES

**Cases**

*Am. Fed'n of Gov't Employees v. Block,*
    655 F.2d 1153 (D.C. Cir. 1981) .......................................................................... 19

*American Radio Relay League, Inc. v. FCC,*
    524 F.3d 227 (D.C. Cir. 2008) ............................................................................ 17

*Analysas Corp. v. Bowles,*
    827 F. Supp. 20 (D.D.C. 1993) ................................................................. 21, 23, 35

*Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Sys.,*
    745 F.2d 677 (D.C. Cir. 1984) ............................................................................ 17

*Brady Campaign to Prevent Gun Violence v. Salazar,*
    612 F.  Supp. 2d 1 (D.D.C. 2009 ........................................................................ 15

*Chamber of Commerce of the U.S. v. Edmondson,*
    594 F.3d 742 (10th Cir. 2010) ............................................................................ 33

*Chamber of Commerce v. SEC,*
    443 F.3d 890 (D.C. Cir. 2006) ............................................................................ 17

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) ............................................................................ 15

* *N. Mariana Islands v. United States,*
    __ F. Supp. 2d __, 2009 WL 4070877 (D.D.C. Nov. 25, 2009) ............................ 20, 23, 24, 35

*Cresote Council v. Johnson,*
    555 F. Supp. 2d 36 (D.D.C. 2008) ...................................................................... 35

*Envtl. Integrity Project v. EPA,*
    425 F.3d 992 (D.C. Cir. 2005) ............................................................................ 24

*Int'l Ladies' Garment Workers' Union v. Donovan,*
    722 F.2d 795 (D.C. Cir. 1983) ............................................................................ 17

*Int'l Union, United Mine Workers of Am. v. MSHA,*
    407 F.3d 1250 (D.C. Cir. 2005) .......................................................................... 16

* *Kollett v. Harris,*
    619 F.2d 134 (1st Cir. 1980) .............................................................................. 19

*Ledbetter v. Baldwin,*
    479 U.S. 1309 (1986) ........................................................................................ 33

*LG Elecs., U.S.A., Inc. v. Dep't of Energy,*
    No. 09-2297, 2010 WL 151983 (D.C. Cir. Jan. 18, 2010) ...................................... 33

*Michigan Citizens for an Independent Press v. Thornburgh,*
    No. 88-2322, WL 90388 (D.D.C. Aug. 17, 1988) ................................................... 1

\* *Mobil Oil Co. v. Dep't of Energy,*
    610 F.2d 796 (Temp. Emer. Ct. App. 1979) ........................................................... 21

\* *N.J. Dep't. of Envtl. Prot. v. EPA,*
    626 F.2d 1038 (D.C. Cir. 1980) ....................................................... 19, 22, 35

*Nat'l Women, Infants and Children's Grocers Ass'n v. Food and Nutrition Services,*
    416 F. Supp. 2d 92 (D.D.C. 2006) .................................................. 19, 21, 35

*Pub. Citizen, Inc. v. FAA,*
    988 F.2d 186 (D.C. Cir. 1993) ............................................................ 17

\* *Sharon Steel Corp. v. EPA,*
    597 F.2d 377 (3d Cir. 1979) ............................................................. 19, 22

*State of Ohio ex rel. Celebrezze v. NRC,*
    812 F.2d 288 (6th Cir. 1987) ............................................................... 1

*Sugar Cane Growers Cooperative of Fla. v. Veneman,*
    289 F.3d 89 (D.C. Cir. 2002) ............................................................. 23

*Tafas v. Dudas,*
    511 F. Supp. 2d 652 (E.D. Va. 2007) ..................................................... 34

\* *Tenn. Gas Pipeline Co. v. FERC,*
    969 F.2d 1141 (D.C. Cir. 1992) .......................................................... 19, 21

*Thrift Depositors of Am., Inc. v. Office of Thrift Supervision,*
    862 F. Supp. 586 (D.D.C. 1994) ......................................................... 21

*Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives,*
    437 F.3d 75 (D.C. Cir. 2006) ............................................................ 18

\* *U.S. Steel Corp. v. EPA,*
    595 F.2d 207 (5th Cir. 1979) ............................................................ 19, 22

*United Steelworkers of Am. v. Marshall,*
    647 F.2d 1189 (D.C. Cir. 1980) .......................................................... 18, 22

*Utility Solid Waste Activities Group v. EPA,*
    236 F.3d 749 (D.C. Cir. 2001) ........................................................... 19

*Winter v. Natural Resources Defense Council,*
    129 S. Ct. 365 (2008) .................................................................. 15

**Statutes**

\* 5 U.S.C. § 553(b) ....................................................................... *passim*

5 U.S.C. § 705 .............................................................................. 1

26 U.S.C. § 9812 ............................................................................ 7

29 U.S.C. § 1185a ........................................................................... 7

\* Mental Health Parity and Addiction Equality Act of 2008,
    Pub. L. 110-343, §§ 511-512 ........................................................ *passim*

42 U.S.C. § 300gg-5 ................................................................................................ 7

**Regulations**

74 Fed. Reg. 19,155 (April 28, 2009) .............................................................. 10, 20

* 75 Fed. Reg. 5410-5451 (Feb. 2, 2010) ........................................................ *passim*

Fed. R. Civ. P. Rule 65 ......................................................................................... 1

Local Rule 65.1 ..................................................................................................... 1

* Pursuant to Local Rule 7(a), authorities upon which the plaintiff chiefly relies are marked with an asterisk in the foregoing Table of Authorities

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Local Rule 65.1, and 5 U.S.C. § 705,[1] Plaintiff Coalition for Parity, Inc. (the "Coalition") seeks a temporary restraining order ("TRO") and preliminary injunction enjoining the Defendants the United States Departments of the Treasury, Labor and Health and Human Services (the "Departments") from implementing the Interim Final Rules Under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Act of 2008; Final Rule, 75 Fed. Reg. 5410, *et seq.* (Feb. 2, 2010) (Ex. 1) ("Interim Final Rules" or "IFR").

## INTRODUCTION

In February, the Departments issued the most complex and far-ranging regulations ever applied to behavioral healthcare, yet they failed to first engage in the requisite notice and comment rulemaking to solicit the affected community's input and guidance. Consequently, the resulting IFR is ill-informed, fatally ambiguous, excessive in scope, and will impede, not enhance, access to mental health and substance abuse treatment and coverage.

Plaintiff is a coalition of managed healthcare organizations that seeks to enjoin the implementation of the IFR on grounds that the Departments violated the Administrative Procedure Act (APA), 5 U.S.C. § 553, by failing to engage in notice and comment rulemaking, resulting in severely flawed regulations that impose obligations far beyond what the Parity

---

[1] 5 U.S.C. § 705 permits a court to postpone the effective date of a challenged rule pending review of that rule to avoid irreparable injury. The relevant factors are the same as those informing the Court's consideration of a request for a temporary restraining order or preliminary injunction. *See Michigan Citizens for an Independent Press v. Thornburgh*, No. 88-2322, 1988 WL 90388, at *3 (D.D.C. Aug. 17, 1988); *State of Ohio ex rel. Celebrezze v. NRC*, 812 F.2d 288, 290 (6th Cir. 1987).

Statute[2] envisioned.  The Coalition satisfies the four prong test necessary to issue an injunction.

First, the Coalition is likely to succeed on the merits.  The Departments blatantly and

indisputably violated the APA by failing, without any legal justification, to subject the far-

reaching IFR to public notice and comment.

Second, the Coalition members will be irreparably harmed if the IFR is enforced without

the opportunity for notice and comment.  In enacting parity legislation, Congress sought to

enhance patient access to behavioral health coverage by equalizing the quantitative components

of a plan's medical and behavioral health benefits, such as the number of permitted provider

visits or the amount of a plan deductible.  Yet, the Departments roam far beyond Congress'

intent by injecting wholly novel, ill-considered and boundless requirements into the IFR that

have no statutory basis.

For example, the IFR requires health plans to maintain a single deductible applicable to a

member's medical and behavioral health benefits.  This is a significant departure from industry

practice permitting separate deductibles and will entail substantial administrative and

technological costs to effectuate.  Moreover, the single deductible requirement will financially

affect vulnerable members who typically have separate small deductibles (if any) for behavioral

health benefits.  Now, they likely will be forced to satisfy a larger unified deductible,

disincentivizing them from seeking treatment for behavioral conditions.

The IFR also stretches parity to include nonquantitative limitations as well as

quantitative.  This ill-defined requirement appears to mandate that the Coalition members map

---

[2] Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008,
enacted as Sections 511 and 512 of the Tax Extenders and Alternative Minimum Tax Relief Act
of 2008, Division C of Pub. L. 110-343 (Oct. 3, 2008) ("MHPAEA" or the "Statute").

each plan's medical and behavioral benefits — a massive and expensive exercise. The Coalition members would then be forced to restructure their business models to mirror the practices, policies and procedures utilized by managed care organizations ("MCOs") to administer medical and surgical benefits. The Coalition members may be forced to jettison time-tested management tools necessary to ensure the proper treatment of patients with serious chronic behavioral health conditions if there is no analog in the medical benefits. Without the benefit of comments from the Coalition members, the Departments fail to grasp the significant differences between medical and behavioral health benefit management and the need to employ distinct management tools in each sector.

The nonquantitative limitation requirement is so boundless and ill-defined that it also appears to morph Congress' intended patient parity into provider parity without any legislative authority to do so. Imposing blind parity in this realm without the benefit of public comment forces an "apples to oranges" comparison, as the credentialing and reimbursement of medical and behavioral health providers is dramatically, and necessarily, different.

The Coalition also satisfies the third and fourth prongs of the TRO analysis. The balance of equities clearly tips towards the Coalition. In the absence of an injunction, the Coalition members will have no opportunity to comment on the IFR prior to the effective date. The Coalition members will be forced to comply with a carelessly drafted rule devoid of their input that affects their network contracts with thousands of behavioral healthcare providers and their ability to oversee proper member care, and that imposes enormous compliance costs that are not recoverable. If an injunction issues, everyone benefits – all members of the affected community will have the opportunity to comment, and the Departments will be in a position to issue an informed Final Rule consistent with the APA. Finally, it is in the public interest for federal

agencies to abide by statutory requirements designed to provide the governed the right to participate in the lawmaking process.

Absent intervention by this Court, the IFR, enacted without notice and comment, is set to go into effect at 12:01 a.m. on Monday April 5, 2010.[3]   A TRO is necessary to preserve the status quo until this Court can schedule a full hearing on the Coalition's motion for a preliminary injunction.  In the absence of emergency relief, the Coalition's members will suffer immediate and irreparable harm by way of mandatory compliance with flawed regulations.

## BACKGROUND

### A.     The Coalition.

Plaintiff is a coalition of managed behavioral healthcare organizations ("MBHOs") that are directly impacted by the IFR.[4]  The Coalition members strongly support the principle of parity and are long-time advocates for passage of the Paul Wellstone and Pete Domenici Mental Health Parity and Addition Equity Act of 2008, Pub. L. 110-343, §§ 511-512 (Oct. 3, 2008) ("MHPAEA" or the "Statute").

The Coalition members typically contract with MCOs or with employers and states to manage behavioral healthcare benefits on behalf of a group health plan or the employer.  In both

---

[3] While the Departments indicate that they will not enforce compliance themselves until July 1, 2010, they acknowledge that the April 5 effective date of the IFR may trigger liability to private parties claiming that a regulated entity has failed to comply with the Statute as it is interpreted by the IFR. *See* 75 Fed. Reg. 5419 ("For purposes of enforcement, the Departments will take into account good-faith efforts to comply with a reasonable interpretation of the statutory MHPAEA requirements with respect to a violation that occurs before [July 1, 2010].  However, this does not prevent participants or beneficiaries from bringing a private action.").

[4] MBHOs exist both as stand-alone specialty healthcare organizations and as organizations within full service health plans.

scenarios, the Coalition member is responsible only for managing the mental health and substance abuse benefits of health plan members.  It does not participate in the management of medical or surgical benefits.  Where an MBHO enters an arrangement with an MCO, it manages the behavioral health benefits for all health plans that the MCOs administer.  In situations where the Coalition member contracts directly with an employer, the employer may be contracted with multiple MCOs to administer medical and surgical benefits while contracting with only one MBHO to administer behavioral health benefits.  Declaration of Anthony M. Kotin, M.D. ¶ 2 (Ex. 2); Declaration of Michael J. McGreal ¶ 2 (Ex. 3).

The Coalition members develop their own utilization management tools, treatment protocols, administrative procedures and network provider reimbursement methodologies reflecting the unique nature of behavioral healthcare.  For example, the Coalition members typically employ a practice known as pre-authorization for outpatient treatment.  Kotin Dec. ¶ 8; McGreal Dec. ¶ 4; Declaration of Daniel McCarthy ¶ 6 (Ex. 4). A patient with a behavioral health issue typically does not know what type of care he requires or where to go to receive that care.  Kotin Dec. ¶ 8; McGreal Dec. ¶ 4.  Unlike outpatient medical care, which typically a physician provides, outpatient behavioral care is provided by a wide range of licensed professionals, including physicians, psychologists, socials workers, counselors, and other therapists.  In addition, the frequency of needed services to treat most behavioral health conditions varies significantly among individual patients whereas many  medical conditions can be treated with a single office visit.  See Kotin Dec. ¶ 8; McCarthy Dec. ¶¶ 6-8.  The Coalition members service approximately 45 million individuals.

The Coalition member works with the patient's behavioral health providers to identify the patient's needs and evaluate the type of initial care needed, and then continues monitoring the

5

level and frequency of care to achieve successful and cost-effective outcomes through a process known as utilization review.  Although this is an invaluable process in managing outpatient behavioral healthcare, it typically has no analog in the administration of outpatient medical benefits and therefore would not be permitted under the IFR.  Kotin Dec. ¶ 8; McGreal Dec. ¶¶ 4-5.

The Coalition members also have built their own national networks of contracted behavioral healthcare providers.  A Coalition member's provider network is a valuable asset reflecting goodwill and high quality services.  Kotin Dec. ¶ 3; McGreal Dec. ¶ 7.  Again, unlike medical care that is predominated by facilities and physicians, there are many different and distinct types of behavioral health providers and treatment settings, including hospitals, residential treatment centers, psychiatrists, psychologists, psychotherapists, therapists, and clinical social workers.  Kotin Dec. ¶ 4; McGreal Dec. ¶ 9.  The Coalition members have spent many years and devoted substantial resources to develop specialized behavioral health provider networks that offer a broad spectrum of providers and care settings in the geographical areas where they contract to provide services.  Id.; Declaration of Matthew Miller ¶ 5 (Ex. 5).

The Coalition members negotiate the rates that they pay the contracted providers in their network.  In exchange, the network providers typically have access to the members of all the plans utilizing the MBHO's services.  The reimbursement methodologies for behavioral healthcare providers are typically quite different than those used to pay medical and surgical providers.  The Coalition members typically pay their network providers on a "fee-for-service" basis under fee schedules that account for factors unique to behavioral health.  Kotin Dec. ¶ 9; McGreal Dec. ¶ 10.  MCOs use several different reimbursement methodologies, including capitation, case rates, percentage of Medicare rates, and percentage of billed charges, to pay

6

medical and surgical providers.  *Id.*  The Coalition members contract with approximately 75,000

behavioral health providers, including facility locations, providing various levels of care

nationwide.  *See* Miller Dec. ¶ 2; McGreal Dec. ¶ 2.

   The Departments themselves tout the practices of entities like the Coalition members and

expressly rely on such organizations to contain costs under the IFR:

> Since the early 1990s, many health insurers and employers have
> made use of specialized vendors known as behavioral health
> carve-outs to manage their mental health and substance abuse
> benefits. . . They use information technology, clinical algorithms
> and selective contracts to control spending on mental health and
> substance abuse treatment.  There is an extensive literature that has
> examined costs savings and impacts on quality of these
> organizations.  Researchers have reviewed this literature and
> estimated reductions in private insurance spending at 20%-48%
> compared to fee-for-service indemnity arrangements.

75 Fed. Reg. 5422 (Feb. 2, 2010).

## B.     Congress Enacts The Parity Statute.

   In 1996, Congress enacted the Mental Health Parity Act, which required parity in

aggregate lifetime and annual dollar limits for mental health benefits and medical and surgical

benefits.  Those parity provisions, which apply to employer-sponsored group health plans and

health insurance coverage offered in connection with a group health plan, were codified in

Section 712 of ERISA, 29 U.S.C. § 1185a, Section 2705 of the Public Health Services Act, 42

U.S.C. § 300gg-5, and Section 9812 of the Internal Revenue Code, 26 U.S.C. § 9812.

   On October 3, 2008, with the full support of the Coalition members, Congress enacted

the MHPAEA, which greatly expands the scope of the 1996 law.  The Statute requires employer-

sponsored group health plans to cover mental illness and substance abuse on the same basis as

physical conditions.  While the MHPAEA does not require employers to provide benefits for

mental health or substance use disorders, group health plans with 50 or more employees that

choose to provide mental health and substance use disorder benefits must do so in parity with medical and surgical benefits.

Behavioral health and medical and surgical health are not mirror images of each other. They involve different kinds of conditions and treatments. For example, attempting to liken the treatment of severe congestive heart failure to major depression is an impossibility. Likewise, the treatment of colon cancer and of schizophrenia involves disparate therapies, prescription medications and healthcare professionals with divergent expertise and training. As a result, the utilization management and treatment protocols for behavioral versus medical conditions are generally not comparable. *See* McGreal Dec. ¶ 3; McCarthy Dec. ¶ 5.

Recognizing that there is not an "apples to apples" comparison between behavioral and medical health, Congress sought to ensure only that the quantitative aspects of medical/surgical and behavioral health benefit plans are equalized to ensure level access to behavioral health services. For example, the Statute requires that "the financial requirements applicable to such mental health or substance use disorder benefits are no more restrictive than the predominant financial requirements applied to substantially all medical and surgical benefits. . ." MHPAEA § 512(a)(1), codified at 29 U.S.C. § 1185a(a)(3)(A)(i). This simply requires that financial requirements such as deductibles and co-payments, which can be empirically compared on an "apples to apples" basis, be equalized for medical and behavioral health services. This is a purely quantitative determination.

The Statute also requires parity in "treatment limitations." Section 512(a)(1), codified at 29 U.S.C. § 1185a(a)(3)(B)(iii), defines the concept of "treatment limitations" as limits on "the frequency of treatment, number of visits, days of coverage or other similar limits on the scope or duration of treatment." Congress clearly intended to ensure that, where quantitative differences

exist between medical and mental health benefits, differences are equalized so that limits on

behavioral health benefits are not more restrictive.  For example, group health plans may limited

the number of days a person may spend in an in-patient mental health care facility in one year

but may not have a corresponding limitation on the number of days spent in a hospital for

medical treatment.  Under the Statute, the plan would either have to abandon the limitation on in-

patient mental health facility days or adopt a similar limitation on hospital stays for medical care.

Given the differences between behavioral health and medical and surgical health, assessing and

implementing quantitative limitations for thousands of plans is a time-consuming and expensive

endeavor requiring complex, labor-intensive, administrative solutions. *See* Declaration of Gary

Anderson ¶¶ 5-6 (Ex. 6).

The changes made by the MHPAEA are generally effective for plan years beginning after

October 3, 2009.  In Section 512(d) of the MHPAEA, Congress instructed the Secretaries of the

Treasury, Labor and Health and Human Services to issue regulations "[n]o later than 1 year after

the date of enactment of this Act."  The Departments, however, failed to issue final regulations

by the October 3, 2009 deadline.  Irrespective of that deadline, the Statute itself is self-executing,

and its terms went into effect on that same one-year anniversary date. *See id.* § 512(e)(1).  Since

October 3, 2009, in lieu of regulatory guidance, Coalition members have adhered to the Statute

in good faith.

### C.     The Coalition Members Seek To Comply With The Statute And Apply Parity To Quantitative Benefits.

Since 2008, the Coalition members, based on the Statute's plain requirements, have

focused their financial, administrative and information technology resources on identifying and

adjusting the quantitative components of benefit plans to ensure parity between the medical and

behavioral health benefits. *See* Anderson Dec. ¶¶ 5-6; McCarthy Dec. ¶ 4.  At no point prior to

the issuance of the IFR did the Coalition members or their MCO or employer customers (or the affected community more broadly) understand the law to require a single deductible or parity relating to nonquantitative components of benefit plans or to in-network provider reimbursement rates. McCarthy Dec. ¶ 2; Anderson Dec. ¶ 6, 10. Indeed, Coalition members understood the plain language of the Statute to permit separate deductibles and out-of-pocket maximums for behavioral health so long as they were at least as favorable for members as the medical deductibles and out-of-pocket maximums. Anderson Dec. ¶ 6. Accordingly, there were no efforts made to achieve uniformity on any of these fronts.

**D.**     **The Departments Wait Six Months and Then Merely Issue a Request for Information.**

Despite the fact that Congress enacted the Statute on October 3, 2008 and ordered implementing rules issued by October 3, 2009, the Departments took no immediate action to gather the information necessary to issue an informed rule. In fact, the Departments did nothing for six months. Finally, on April 28, 2009, the Departments acted, but did not issue proposed rules subject to notice and comment. Rather, they merely published a "request for information" in the Federal Register. 74 Fed. Reg. 19,155 (April 28, 2009). The request for information is a four-page document seeking general information pertaining to the clinical and financial effects of implementing the statute. The request does not set forth the language of any proposed regulation. Nor does the request for information even reference the concept of nonquantitative limitations.

**E.**     **The Departments Issue The IFR Without Notice And Comment.**

On February 2, 2010, the Departments issued the IFR. 75 Fed. Reg. 5410-5451. Yet, the Departments dispensed with mandatory rulemaking procedures requiring public notice of the proposed rule followed by an opportunity for affected parties to comment and make suggestions

10

for improvement.  *See* 5 U.S.C. § 553.  According to the Defendants, they promulgated the IFR

without notice or comment because, ostensibly:

> some members of the regulated community may not know what
> steps to take to comply with the requirements of MHPAEA, which
> may result in an adverse impact on participants and beneficiaries
> with regard to their health benefits under group health plans and
> the protections provided under MHPAEA.  Moreover, MHPAEA's
> requirements will affect the regulated community in the immediate
> future....   Plan administrators and sponsors, issuers, and
> participants need guidance on how to comply with the new
> statutory provisions.

75 Fed. Reg. at 5419.  Contrary to the Defendants' purported rationale for circumventing their

notice and comment obligations, the MHPAEA already affected the regulated community as of

October 3, 2009.  Efforts to comply with the Statute's plain requirements had been well under

way prior to that date.  *See* Anderson Dec. ¶¶ 5-6; McCarthy Dec. ¶ 2.  In any event, the

Defendants made no effort to explain why, if the regulated community was allegedly in need of

additional guidance carrying the force and effect of law, they failed to promulgate the IFR prior

to the Statute's effective date four months earlier, or why they failed to engage in notice-and-

comment rulemaking in the 16 months since passage of the Statute.

**F.      The IFR Would Effect Far-Reaching Changes Not Contemplated By The MHPAEA.**

In general, the MHPAEA requires group health plans and group health insurance issuers

to ensure that financial requirements (*e.g.*, deductibles, copays) and treatment limitations (*e.g.*

limits on inpatient treatment days or number of visits) applicable to behavioral health or

substance use disorder benefits are no more restrictive than the predominant financial

requirements and treatment limitations applied to substantially all medical and surgical benefits

under the same plan.  MHPAEA § 512(a)(1), codified at 29 U.S.C. § 1185a(a)(3).

11

The Departments, however, promulgated a number of ambiguous provisions not authorized by the Statute that are subject to various interpretations. The IFR's ambiguity precludes uniform compliance. Nonetheless, the Departments issued this far reaching IFR without notice and comment from the affected community. The most troubling of these novel concepts is the inclusion of parity for nonquantitative limitations. In the "Definitions" section, Congress gave examples of the type of "treatment limitations" for which parity would be required – limits on "the frequency of treatment, number of visits, days of coverage or other similar limits on the scope or duration of treatment." *Id.* Notably, every one of these examples is a *quantitative* limitation. The Coalition members, accordingly, have spent the past 16 months engaged in efforts to equalize quantitative limitations between behavioral heath and medical benefits. *See* Anderson Dec. ¶¶ 5-6; McCarthy Dec. ¶ 2.

The IFR requires, however, parity for undefined, subjective and seemingly unlimited "nonquantitative limitations." *See* 75 Fed. Reg. 5413. The Departments provide an "illustrative list of nonquantitative treatment limitations" that demonstrates its boundless breadth:

> Nonquantitative treatment limitations include – (A) Medical management standards limiting or excluding benefits based on medical necessity or medical appropriateness, or based on whether the treatment is experimental or investigative; (B) Formulary design for prescription drugs; (C) Standards for provider admission to participate in a network, including reimbursement rates; (D) Plan methods for determining usual, customary and reasonable charges; (E) Refusal to pay for higher-cost therapies until it can be shown that a lower-cost therapy is not effective (also known as fail-first policies or step therapy policies); and (F) Exclusions based on failure to complete a course of treatment. (75 Fed. Reg. 5443).

The scope of these examples reaches virtually every policy, procedure, practice and management tool, including pre-authorization, utilized by the Coalition members to efficiently and appropriately manage behavioral healthcare benefits. Because they failed to seek public

input, the Departments clearly do not grasp that their expansion of parity to include nonquantitative treatment limitations affects the very tools the Departments praise the MBHOs for providing. *See* 75 Fed. Reg. 5422.

The Departments also extirpate without authority the longstanding practice of maintaining separate medical/surgical and behavioral health deductibles by requiring each plan to maintain a single deductible. *See* 75 Fed. Reg. 5415 (admitting the "provisions of the statute imposing parity on financial requirements and treatment limitations do not specifically address" whether separate or single deductibles are required); *id.* at 5442 (imposing single deductible requirement). Maintaining separate deductibles is substantially more efficient from an administrative perspective, because the separate MBHO (behavioral health claims) and MCO (medical/surgical claims) claims processing systems do not traditionally interface with one another. *See* Anderson Dec. ¶ 7. A single deductible requirement would require massive overhaul of the claims systems on both sides, and the establishment of real-time data transfer to track patient utilization of each benefit to determine whether the deductible has been satisfied. *Id.* While recognizing that nothing in the Statute requires or authorizes them to do so, the Departments cavalierly chose to ban the long-established practice of separate deductibles and require a single deductible aggregating medical and behavioral health benefits without the benefit of any public comment. 75 Fed. Reg. 5421, 5442. The associated costs are enormous, as the Departments recognize. *Id.* at 5425-26. Moreover, the Departments themselves admit that

13

they are "uncertain" about the extent to which the costs associated with the single deductible will be passed on to the plan participants.[5]  *Id.* at 5424-26.

These unforeseen new requirements have no basis in the MHPAEA and impose substantial administrative, technical and cost burdens on the Coalition members.  Indeed, the Coalition members are uncertain whether certain aspects of the IFR can even be addressed from an IT perspective.  Attempts to comply will require an enormous investment of money and time.  Anderson Dec. ¶¶ 11-17, 20; McGreal Dec. ¶ 12.

### G.    The Departments Acknowledge That Their Examples Of Nonquantitative Limitations Do Not Reflect Reality.

The IFR, itself, acknowledges the difficulty in equalizing medical and mental health procedures, the Departments' failure to gather sufficient information before issuing the IFR, and the sheer complexity of the rule.  In addressing the novel nonquantitative limitation requirement, the Departments include several examples intended to facilitate compliance.  Stunningly, the Departments admit these examples do not reflect reality:

> The facts in the examples reflect simple situations for purposes of better illustrating the application of the rules rather than reflecting the realistic, complex facts that would typically be found in a plan. (75 Fed. Reg.  5416 February 2. 2010).

The Departments do not understand the reality of the situation because they did not subject these complex rules to public notice and comment.  The purported guidance provided by these simplistic examples serves only to confuse the issue further.

---

[5] The IFR's cost projections are inherently flawed, as they fail to even address the costs associated with complying with the nonquantitative treatment requirements.  *See generally* 75 Fed. Reg. 5425-5427.  Moreover, even the quantitative cost estimates are flawed because they fail to account for the plan-by-plan analysis required to identify and equalize quantitative treatment limitations.

**APPLICABLE STANDARD**

This Court considers the same four factors in deciding whether to issue a TRO as it considers in evaluating the Coalition's motion for preliminary injunction: (1) the likelihood of success on the merits; (2) the irreparable harm to the plaintiff if the TRO (or injunction) is not granted; (3) whether the equities, on balance, favor a TRO (or injunction); and (4) the public interest. *See Winter v. Natural Resources Defense Council*, 129 S. Ct. 365, 374 (2008); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Although the moving party bears the burden on all four factors, it is not necessary for the moving party to make an equally strong showing on each. Rather, in the D.C. Circuit, "district courts may employ a sliding scale under which a particularly strong showing in one area can compensate for weakness in another." *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 11-12 (D.D.C. 2009) (stating that the Supreme Court's *Winter* decision does not affect the sliding scale analysis); *see also England*, 454 F.3d at 297. Thus, "[i]f the showing in one area is particularly strong, an injunction may issue even if the showings in the other areas is rather weak." *England*, 454 F.3d at 297.

Irrespective of the sliding scale, each of the four factors weighs in favor of a TRO and preliminary injunction enjoining implementation of the Interim Final Rules until a full notice and comment period is allowed.

**ARGUMENT**

**I.**

**THE COALITION IS LIKELY TO SUCCEED ON THE MERITS.**

The APA requires federal agencies to publish in the Federal Register, prior to the promulgation of any regulation, a general notice of proposed rulemaking that includes, *inter alia*,

(1) a statement of the time, place, and nature of the rulemaking, (2) a reference to the legal

authority pursuant to which the rulemaking is being proposed, and (3) either the terms or

substance of the proposed rule, or a description of the proposed rule's subjects and issues. *See* 5

U.S.C. § 553(b)(1)-(3).  After this notice is published, "the agency shall give interested persons

an opportunity to participate in the rule making through submission of written data, views, or

arguments with or without opportunity for oral presentation." *Id.* § 553(c).  Comments must be

considered and addressed in the notice of final rulemaking:  "[a]fter consideration of the relevant

matter presented, the agency shall incorporate in the rules adopted a concise general statement of

their basis and purpose." *Id.*  There is no dispute that the Departments failed to adhere to these

requirements.

A.      **The APA's Notice-and-Comment Requirements Serve An Important Due
        Process Function That Cannot Be Ignored.**

        The importance of the notice and comment requirement is well established.  The D.C.

Circuit has repeatedly observed that providing notice and opportunity for comment before taking

regulatory action improves the quality of administrative rulemaking and enhances the quality of

judicial review of agency actions:

> Notice requirements are designed (1) to ensure that agency
> regulations are tested via exposure to diverse public comment, (2)
> to ensure fairness to affected parties, and (3) to give affected
> parties an opportunity to develop evidence in the record to support
> their objections to the rule and thereby enhance the quality of
> judicial review.

*Int'l Union, United Mine Workers of Am. v. MSHA*, 407 F.3d 1250, 1259 (D.C. Cir. 2005).  As

the Court of Appeals emphasized in *American Radio Relay League, Inc. v. FCC*, the APA's

notice-and-comment requirements exist to "give interested persons an opportunity to participate

16

in the rule making through submission of written data, views, or arguments." 524 F.3d 227, 236

(D.C. Cir. 2008) (citing 5 U.S.C. § 553(b)-(c)).  The *American Radio* Court stated further:

> By requiring the 'most critical factual material' used by the agency
> be subjected to informed comment, the APA provides a procedural
> device to ensure that agency regulations are tested through
> exposure to public comment, to afford affected parties an
> opportunity to present comment and evidence to support their
> positions, and thereby to enhance the quality of judicial review.

*Id.* (quoting *Chamber of Commerce v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006) (quoting *Ass'n of*

*Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 745 F.2d 677,

684 (D.C. Cir. 1984)).

When agencies forgo their notice-and-comment obligations, the public and regulated

community are left out of the rulemaking process entirely.  In turn, the agencies are deprived of

the benefit of important comments that surely would have otherwise been submitted.  *See Pub.*

*Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993).  By ignoring the notice-and-comment

period, the agencies also abdicate their responsibility to consider alternative proposals and

explain publicly why the alternatives were rejected.  *See Int'l Ladies' Garment Workers' Union v.*

*Donovan*, 722 F.2d 795, 815 (D.C. Cir. 1983) (holding that the "the Secretary [of Labor] failed

to provide any explanation for his implicit rejection of alternatives...").  Notice and comment

provides a critical public platform for addressing the practical effects of a proposed rule on those

most affected by its promulgation, and for revising the rule to minimize its unintended and/or

unnecessary negative consequences.

Where, as here, the public was not permitted to scrutinize or critique the Departments'

rationale, or to determine whether the proposed regulations are justified and based on legitimate

statutory grounds, the very purpose of the notice and comment requirement is defeated.  The

notice-and-comment rulemaking procedures were designed to ensure that affected stakeholders

would be made aware of what the public agencies empowered to regulate them are doing, and to provide those stakeholders with an opportunity to challenge the agency's views, and perhaps even change them. *See United Steelworkers of Am. v. Marshall*, 647 F.2d 1189, 1225 (D.C. Cir. 1980) (noting importance of notice-and-comment procedures for airing "criticisms which the Agency might find convincing"). Without the benefit of contemporaneous public feedback, it would be impossible to find that the Interim Final Rules were the product of reasoned decision-making – the litmus test of permissible rulemaking. *See Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006).[6]

**B.     The So-Called "Good Cause" Exception Invoked By Defendants Does Not Apply In This Case.**

The APA recognizes limited exceptions to the requirement that agencies must engage in notice-and-comment rulemaking. *See* 5 U.S.C. § 553(b)(A), (B). Here, the Defendants invoke the so-called "good cause" exception of 5 U.S.C. § 553(b)(B). That exception provides: "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefore in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest," the agency need not give notice and entertain public comment in advance of a rulemaking. *See id.* § 553(b)(B). The Departments admit they have bypassed the required notice and comment period, but claim to be excused from this requirement on grounds that the "regulated community" allegedly requires "prompt guidance." 75 Fed. Reg. at 5419.

---

[6] Moreover, the Departments' actions deprive a reviewing court of any meaningful administrative record  to evaluate whether the Departments abused their discretion in promulgating such far-reaching requirements.

This explanation does not justify the gross departure from traditional rulemaking procedures. Agency efforts to avoid the notice-and-comment procedures required by Section 553(b) are "closely scrutinized." *Nat'l Women, Infants and Children's Grocers Ass'n v. Food and Nutrition Services*, 416 F. Supp. 2d 92, 104 (D.D.C. 2006). In light of the importance of the notice and comment requirement, an agency's attempt to invoke the "good cause" exception must be "narrowly construed and only reluctantly countenanced." *Tenn. Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1144 (D.C. Cir. 1992) (quoting *N.J. Dep't. of Envtl. Prot. v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980)). The courts do not permit federal agencies to treat the good cause exception as an "escape clause" from their notice-and-comment obligations; rather, the "good cause" exception is limited to "emergency situations." *Utility Solid Waste Activities Group v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) (quoting *Am. Fed'n of Gov't Employees v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981)).

The Departments may not simply announce that the regulated community is in dire need of guidance and thereby avoid their notice and comment obligations. Nor can the Departments manufacture an "emergency" through their own dilatoriness, and then suggest that "emergency" permits them to avoid notice-and-comment rulemaking on grounds of impracticability. For example, in *Kollett v. Harris*, the First Circuit struck down "interim" regulations that had not been subjected to notice and comment, rejecting the agency's contention that its regulations were necessary because the underlying statute had gone into effect three weeks earlier. 619 F.2d 134, 145 (1st Cir. 1980). Noting that the statute had been signed into law 14 months prior to its effective date, the First Circuit held that the agency could have and should have engaged in notice-and-comment rulemaking within that period. *See id.* Other federal appellate courts reach the same conclusion. *Accord Sharon Steel Corp. v. EPA*, 597 F.2d 377, 380 (3d Cir. 1979) (one-

year deadline to promulgate regulations no excuse to forgo notice and comment); *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 213 (5th Cir. 1979) (six-month deadline no excuse to forgo notice and comment). Indeed, only four months ago, this Court held that failure of a federal agency to act within the time allowed is insufficient to constitute "good cause" to dispense with notice and comment rulemaking. *See N. Mariana Islands v. United States*, __ F. Supp. 2d __, 2009 WL 4070877, at *10 (D.D.C. Nov. 25, 2009) (enjoining "interim" immigration rule where the agency failed to avail itself of an 18-month period to provide notice or an opportunity for comment).

To the extent the Departments ran out of time, this was a problem of their own making. The Departments knew in October 2008 that they needed to craft and promulgate regulations within one year. Yet, rather than immediately begin gathering the data necessary to draft informed, logical rules, they apparently did nothing for six months. Finally, on April 28, 2009, the Departments issued a "Request for Information" – a four page document published in the Federal Register seeking general information pertaining to the clinical and financial effects of implementing the statute. *See* 74 Fed. Reg. 19,155 (April 28, 2009).

The Request for Information does not contain the language of any proposed regulation, nor does it forecast the provisions set forth in the Interim Final Rule. Without comment, the Departments failed to issue regulations by the October 3, 2009 deadline. The self-executing Statute, however, went into effect on that date. Since October, the Coalition's members and other members of the affected community have been complying with the Statute in good faith, in the absence of formal regulations from the Departments. *See* Anderson Dec. ¶¶ 5-6; McCarthy Dec. ¶ 4. To suggest that a delay of 60 days to permit notice and comment would be impracticable ignores the reality that the regulated community has already been preparing to and complying without guidance since the Statute's enactment.

Even if it were true that the regulated community required immediate guidance, this is

not good cause for avoiding notice and comment.  *See Nat'l Women, Infants and Children's*

*Grocers Ass'n*, 416 F. Supp. 2d at 107 (the need to provide guidance is not a stand-alone basis to

avoid the comment period); *Analysas Corp. v. Bowles*, 827 F. Supp. 20, 23-24 (D.D.C. 1993)

(rejecting idea that minimal delay in rulemaking to provide for notice and comment would be

detrimental to regulated community).  As one appellate court explained:

> It is axiomatic that a mere recital of good cause does not create
> good cause.  Similarly, a desire to provide immediate guidance,
> without more, does not suffice for good cause…. [I]f the
> conclusory statement that normal procedures were not followed
> because of the need to provide immediate guidance and
> information constitutes good cause, then an exception to the notice
> requirement would be created that would swallow the rule.

*Mobil Oil Co. v. Dep't of Energy*, 610 F.2d 796, 803 (Temp. Emer. Ct. App. 1979) (internal

quotation omitted).

### C.   The "Interim" Status Of The Rules Is Irrelevant To The Procedural Impropriety Of Their Promulgation.

It is no justification that the challenged rules are nominally "interim."  The "interim"

status of a rule does not give an agency carte blanche to ignore its notice and comment

obligations.  *See Tenn. Gas*, 969 F.2d at 1145 (pointing out that were the exception construed

otherwise, it would swallow the general rule by allowing agencies to manufacture "limited" rules

to avoid notice and comment).  In similar situations, courts do not hesitate to vacate such rules

for failure to engage in the notice-and-comment process.  *See, e.g., Thrift Depositors of Am., Inc.*

*v. Office of Thrift Supervision*, 862 F. Supp. 586, 593 (D.D.C. 1994).

Nor are the Departments excused because they solicited post-promulgation comments on

the IFR.  The rules are now law and, without Court intervention, will go into effect on April 5.

The ramifications of that act cannot be undone.  Courts have repeatedly recognized that a post-

promulgation comment period does not cure a failure to provide for pre-promulgation notice and comment as required by the APA. This is because agencies have substantially less incentive to give serious consideration to any *ex post facto* comments that may be received. *See N.J. Dep't of Envtl. Prot. v. EPA*, 626 F.2d 1038, 1049 (D.C. Cir. 1980) ("Section 553 is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas."); *U.S. Steel Corp.*, 595 F.2d at 214-15 ("Permitting the submission of views after the effective date is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule making process in a meaningful way... 'We doubt that persons would bother to submit their views or that the Secretary would seriously consider their suggestions after the regulations are a Fait accompli.'") (citation omitted); *Sharon Steel*, 597 F.2d at 381 ("If a period of comments after issuance of a rule could cure a violation of the APA's requirements, an agency could negate at will the Congressional decision that notice and an opportunity for comment must precede promulgation."). The point of the pre-promulgation comment period is to allow for "criticisms which the Agency might find convincing." *USWA v. Marshall*, 647 F.2d at 1225. The Defendants' will have little motivation to listen to the public critique now that the deed – and damage – is done.

The Fifth Circuit's decision in *U.S. Steel Corp.* is instructive. There, the Environmental Protection Agency ("EPA") claimed that in light of a short deadline imposed by Congress, it was under pressure to issue a rule and the usual notice-and-comment requirements therefore did not apply. *See* 595 F.2d at 213. The court disagreed, and rejected each of EPA's proffered justifications for invoking the "good cause" exception, holding that: (i) "the mere existence of deadlines for agency action, whether set by statute or court order, does not in itself constitute

good cause for a § 553(b)(B) exception," *id.*; (ii) "the need to provide guidance" could have been accommodated without avoiding notice and comment, *id.* at 214; (iii) "[p]ermitting the submission of views after the effective date is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule making process in a meaningful way," *see id.* (citation omitted); and (iv) the agency's failure to provide notice and comment was not harmless error. *See id.* at 215.

Here, the Defendants' proffered reason for jettisoning notice and comment in advance of promulgating the Interim Final Rules does not satisfy the great burden placed on them to justify the application of that exception. On the contrary, "the *more* important the rule. . . , the *more* the need for public participation in its formulation." *Analysas Corp.*, 827 F. Supp. at 25 (emphasis in original). For these reasons, the Coalition is likely to succeed on the merits of its claim that the Departments violated the strictures of the APA in promulgating the Interim Final Rules without notice and comment.

## II.

### THE COALITION'S MEMBERS WILL BE IRREPARABLY HARMED IF THE TRO IS NOT ISSUED.

It is indisputable that an agency's failure to engage in notice-and-comment rulemaking harms those members of the public denied the right to comment on the rule. *See Sugar Cane Growers Cooperative of Fla. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002); *N. Mariana Islands*, __ F. Supp. 2d at __, 2009 WL 4070877, at *6. Furthermore, where the rule in question is "complex and far-reaching," and where the anticipated harm could not be cured by ultimate success on the merits, courts find that the deprivation of this vital procedural right is an irreparable harm for which an injunction can and should be issued. *See, e.g., N. Mariana Islands*, 2009 WL 4070877, at *6-7.

23

This Court's recent decision in *Northern Mariana Islands* affirms the need for injunctive relief where the government shirks its notice and comment duty. In that case, the Court addressed the invocation by the Department of Homeland Security ("DHS") of the good cause exception when it promulgated a set of "interim" immigration regulations that drastically altered the plaintiff's immigration policies. *See* 2009 WL 4070877, at *7 ("The Interim Permit Rule challenged here will dramatically alter the Commonwealth's current system for admitting non-resident guestworkers, who constitute two-thirds of the [Commonwealth's] private workforce."). The Court found that irreparable harm would result absent an injunction because the challenged interim rule would:

> enact far-reaching changes that likely will have significant effects on the [Commonwealth's] labor market, and it will do so despite the fact that it has not 'been tested via exposure to diverse public comment.'

*Id.* (quoting *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005)).

While acknowledging that the Commonwealth's injury was "not so great as others that have justified the issuance of preliminary injunctions," this Court found the alleged harms to be "actual" and "great" when coupled with the procedural infirmities in the rule's promulgation. *Id.* at *8. The Court's primary concern focused on DHS's denial of the opportunity to comment on the new and complex regulatory system in advance of its promulgation. *Id.* Accordingly, this Court enjoined the interim rule.

Here, as in *Northern Mariana Islands*, the far-reaching nature of the regulations requires an injunction, particularly when considered in light of the Coalition's likelihood of success on the merits. The IFR will dramatically alter the entire group health insurance industry, a far greater impact than the Interim Permit Rule in *Northern Mariana Islands*. The harm resulting from the lack of notice-and-comment is particularly pronounced because the stated objectives of the IFR

24

are undermined by its own ill informed requirements.  The Departments tout the MBHO model

as critical to the success of the parity regime.  Specifically, the Departments endorse:

> the ability of behavioral health carve-outs to use utilization
> management tools to control utilization and spending in the face of
> reductions in cost-sharing and elimination of limits.  Thus, parity
> in a world dominated by behavioral carve-outs has meant increased
> utilization rates, reduced provider fees, reduced rates of
> hospitalization and fewer very long episodes of outpatient care.
> Intensive treatment was more closely aligned with higher levels of
> severity.

75 Fed. Reg. 5422.

The Coalition strongly agrees with the Departments that MBHOs enhance the provision

of behavioral healthcare benefits, and improve patient care and management.  Yet, in the absence

of comments, the Departments seemingly do not comprehend that the far ranging IFR affects

the Coalition members' ability to provide these very same touted benefits.  Had the Departments

engaged in a notice-and-comment period, they would have understood that the IFR will

undermine these shared goals.

## A.     The Coalition Members Will Be Irreparably Harmed By The Single Deductible Requirement.

The IFR requires plans to implement a single deductible applicable to both behavioral

and physical health benefits, a requirement found nowhere in the Statute.  *See* 75 Fed. Reg. 5415

(admitting the "provisions of the statute imposing parity on financial requirements and treatment

limitations do not specifically address" whether separate or single deductibles are required); *id.*

at 5442 (imposing single deductible requirement).  This requirement marks a dramatic departure

from existing practice in the industry, which currently permits separate deductibles for the

medical and behavioral health portions of a benefit plan.  Kotin Dec. ¶ 11.  A unified deductible

acts as a barrier to those "medically" healthy members who nevertheless suffer from behavioral

health conditions.  The combined and, in most cases, presumably higher single deductible for

behavioral and medical treatments acts as a disincentive for lower income plan members in accessing behavioral health benefits. *Id.* The single deductible inevitably will be higher than the stand-alone behavioral health deductible, which in many group health plans is lower than the medical deductible. *Id.* This is an especially acute issue for those needing substance abuse treatment, a large percentage of whom are younger adults with limited incomes. Again, while this wrinkle might not be readily apparent to the Departments tasked with the rulemaking, it is the very reason for a notice and comment period prior to finalizing a rule.

Moreover, this provision will require the wholly separate and distinct claims systems of Coalition members and MCOs to interface with each other in real-time, each time a health plan member receives medical or mental health treatment. Anderson Dec. ¶ 7. While seemingly straightforward in concept, the task of requiring multiple different claims systems to "talk to each other" on anything resembling a real-time basis is a task of monumental proportion that the Departments did not appreciate precisely because they ignored the mandatory notice and comment period prior to issuance of a final rule.

For example, each time a plan member seeks a medical or behavioral health service, both the MCO and the Coalition member will have to have a system in place to determine whether the service was covered by the terms of the plan, what amounts were billed by the provider, what amounts were paid by the plan member, a calculation of the amount to be applied to the deductibles, including individual and family, a system recognition of the combined deductible limit for that member and a trigger identifying at which point the member has satisfied that deductible. Anderson Dec. ¶ 7. While the foregoing is complicated in and of itself, the real difficulty is in bridging the completely distinct claims adjudication systems utilized by MCOs and the Coalition members so that they can jointly contribute information to a unified deductible.

*Id.* Coalition members believe that they will have to devote substantial resources that will be passed onto the industry and, eventually, consumers.[7]

### B. Compliance With The IFR's Novel And Confusing Nonquantitative Limitations Requirements Affects Utilization Management And Patient Care.

In enacting the MHPAEA, Congress sought to equalize the quantitative components of medical and behavioral health benefits provided by group health plans. Departing from the statutory definition of "treatment limitations," which addressed solely quantitative limitations, the Departments grafted a requirement into the IFR requiring plans to provide parity for nonquantitative limitations as well. The wholly new and ill-defined "nonquantitative" limitations will require the Coalition members to review thousands of plans to determine if there are nonquantitative limitations set forth in medical benefits that must be addressed in each plan's behavioral health benefit. *See* McCarthy Dec. ¶ 10; Anderson Dec. ¶ 13; Kotin Dec. ¶ 8. This review must be undertaken without any clear or informed guidance as to what constitutes a nonquantitative limitation. Kotin Dec. ¶ 7. These nebulous provisions force a virtually impossible "apples to oranges" comparison of practices that do not translate across the medical and behavioral health arenas. McCarthy Dec. ¶ 10.

The nonquantitative limitation requirement appears to be the Departments' attempt to homogenize all policies, practices and procedures between mental health and medical and surgical health. The fundamental differences between all aspects of these distinct realms, however, preclude mirror practices. *See* Kotin Dec. ¶¶ 3-7; McCarthy Dec. ¶ 5; McGreal Dec.

---

[7] The single deductible requirement is also likely to adversely affect provider reimbursement and will result in unnecessary administrative burdens leading to corresponding cost increases. The Departments themselves admit they are "uncertain" regarding the extent to which the costs associated with the single deductible will be passed on to the plan participants. 75 Fed. Reg. 5425-26. It is the precise purpose of a notice and comment period to eliminate such uncertainty and gather data to issue an informed rule.

¶ 3.  Nor does the MHPAEA even remotely suggest that mental and medical health benefits must be managed in the same way.

Most importantly, requiring strict parity between all parts of the medical and behavioral healthcare benefits under group health plans will adversely affect patient care, turning the Statute's intended goal on its head.  For example, pre-certification or pre-authorization requirements for out-patient care are critical tools to ensure that plan members are receiving the behavioral healthcare services that they need from the most appropriate level of provider and in the most appropriate treatment setting.  McGreal Dec. ¶¶ 4-5; Kotin Dec. ¶ 8; McCarthy Dec. ¶¶ 6-8.  Any interpretation of the IFR that results in the elimination of pre-authorization requirements will adversely affect the most vulnerable mental health patients because the tools employed to monitor their treatment will be gone.  McGreal Dec. ¶ 6.

For example, once an MBHO identifies patients with schizophrenia, they receive "targeted case management" with intensive follow-up to ensure that they attend therapy and are compliant with their medication regimen.  *See* McCarthy Dec. ¶ 6.  In coordination with the Coalition member, the behavioral healthcare providers develop a treatment plan which the Coalition member monitors for compliance and progress.  *Id.* ¶ 7; McGreal Dec. ¶ 5.  These utilization management efforts are aimed at improving the patient's condition, providing the appropriate level of care, and avoiding the need for in-patient hospitalization, which often carries a stigma and which is frequently resisted by patients.  *Id.*

If the pre-authorization tool is rendered unlawful, the most vulnerable plan members cannot be monitored and their behavioral health status will be put at risk. McCarthy Dec. ¶¶ 8-9; McGreal Dec. ¶ 6.  Some behavioral health patients, especially those with severe behavioral health diagnoses are socially isolated and withdrawn.  McCarthy Dec. ¶ 8.  In the absence of

28

utilization management tools such as preauthorization, these patients are likely to skip appointments, stop seeking care and cease taking necessary medications. *Id.* These management tools allow the Coalition members to track such patients and intervene before their condition worsens and their treatment becomes more intensive and expensive. *Id.* Without care management support services and monitoring, these patients might not engage the system until a crisis occurs requiring in-patient care. By that time months will have passed during which less costly, less invasive therapeutic methods could have been employed to encourage community tenure. *Id.*

The IFR's nonquantitative limitation requirements appear to strip these tools away merely because there is oftentimes no need for outpatient pre-authorization in the medical/surgical context. *See* Kotin Dec. ¶ 8; McGreal Dec. ¶ 4. Because the IFR was not subject to notice and comment, the Departments imposed a "one size fits all" solution without recognizing these fundamental differences.

**C.    The IFR Threatens The Coalition Members' Ability To Maintain Competitive And High Quality Provider Networks.**

The IFR suffers from substantial ambiguity and, in places, appears to have been randomly cobbled together. This renders the IFR susceptible to dramatically different interpretations which could have been avoided through notice and comment. The concept of nonquantitative limitations is itself inherently ambiguous. The Departments, however, in attempting to illustrate examples of nonquantitative limitations, compound the confusion and seemingly extend parity from the patient realm to the provider realm. In the IFR's "illustrative list of nonquantitative treatment limitations" the Departments include: "(C) Standards for provider admission in a network, including reimbursement rates." 75 Fed Reg. 5443. This would appear to require the equalization of medical and behavioral health credentialing practices and

29

provider rates.  Again this would fly in the face of the IFR's endorsement of the MBHO model's unique ability to enhance utilization while maintaining rate efficiencies.

Mandated equalization of medical and behavioral health provider rates under the IFR would require Coalition members to abandon traditional modes of provider reimbursement, leading to permanent changes to their MBHO specialty networks.  Miller Dec. ¶¶ 4-5; McGreal Dec. ¶¶ 8-11; Kotin Dec. ¶ 9.  Coalition members contract with a number of HMOs to provide behavioral health care management and administration.  The Coalition members reimburse their contracted network providers primarily on a fee-for-service basis, with the contracted rates typically applicable to all plans administered by the MBHO. *See* Kotin Dec. ¶ 9; McGreal Dec. ¶ 10.  This unique arrangement incentivizes providers to join the MBHO network.  Instead of contracting with each plan separately, the provider is able to deal with only one contract and one set of rates. *Id.*

HMOs, however, reimburse many of their contracted providers on many different bases The nonquantitative limitation example appears to require that  the Coalition members determine and evaluate  network provider reimbursement in their plan-by-plan analyses of nonquantitative treatment limits.  Depending on the results of this massive undertaking involving over 75,000 providers, the MBHO fee-for-service arrangement may be altered or eliminated, and another rate methodology adopted for behavioral health administration.  Equalized fee arrangements together with the requirement to have separate rates applicable for each plan administered by the MBHO would create a disincentive for providers to join or remain in the Coalition member's network. *See* McGreal Dec. ¶¶ 10-11; Kotin Dec. ¶ 9.

Moreover, any required equalization of credentialing standards for provider admission to a network under the IFR would disrupt the manner in which the Coalition members maintain

their provider networks.  An MBHO's ability to employ highly specialized credentialing standards for the many different types of providers treating behavioral health conditions ensures a qualified and robust network of providers for plan members.  Kotin Dec. ¶ 4; McGreal Dec. ¶ 7; Miller Dec. ¶ 4.  Credentialing of medical providers and behavioral health providers is another "apples to oranges" comparison that the Departments failed to recognize in promulgating the IFR without notice and comment. *See* Miller Dec. ¶ 4.  The effect of equalization in credentialing would force Coalition members to operate at the least common denominator by eliminating specialized behavioral health credentialing standards.

If the MBHOs are unable to sustain their established network reimbursement and credentialing practices – practices that the Departments have praised – there is little incentive for behavioral healthcare providers to join or remain in their networks. *See* McGreal Dec. ¶¶ 10-11; Kotin Dec. ¶ 9.  The impropriety of even suggesting parity for admission to provider networks and network reimbursement rates would have been patently obvious to the Departments had they engaged in the notice and comment period that such complex issues require.

D.     **The Ill-Informed Nature Of The IFR Precludes Complete And Timely Compliance.**

By failing to issue *any* regulations for sixteen months after the Statute was enacted, the Departments have forced a needlessly compressed compliance schedule on the Coalition members and other regulated entities.  As a threshold matter, setting aside the ambiguity and self-contradictory nature of the regulations, the burden imposed by a requirement to implement sweeping regulatory reform not addressed in the underlying statute within five months of publication of the IFR is overwhelming and completely disruptive to the normal business operations of Coalition members.

Yet this assumes that full compliance is even possible.  Because the Departments failed to solicit feedback from the Coalition members and other behavioral health benefit providers, they fail to recognize the extent of the burdens imposed by the IFR's provisions.  For example, technology tools to facilitate meaningful compliance with the nonquantitative limitations requirement simply do not exist.  Anderson Dec. ¶ 16.  Rather, the Coalition members will first need to manually determine for each customer (and for each plan offered by each customer) what "nonquantitative limitations" exist.  *Id.* ¶ 13.  Once they are identified, they must be compared to nonquantitative limitations applied to the behavioral health and substance use disorder benefits offered by the MBHO.  *Id.* ¶ 14.  As discussed above, this is an exercise in comparing apples to oranges.   Even if a meaningful comparison could be made, there is simply no tool available to track these limitations from an information technology perspective.  Instead, a custom solution must be developed.  The labor and cost involved with this effort is substantial.  *Id.* ¶¶ 15-17.  Moreover these avoidable costs will be passed on to the Coalition members' customers, likely resulting in higher premiums.

The same problem arises as a result of the ambiguity in the IFR's example identifying provider network reimbursement parity as a nonquantitative limitation.  If that example is enforced and the Departments impose parity in network provider reimbursement, the Coalition members will need to determine for each customer (and each plan) (i) how each behavioral healthcare provider is paid; (ii) how each MCO pays providers under the corresponding medical benefits (proprietary information unlikely to be forthcoming); (iii) how to compare these methodologies and (iv) what "parity" means in this context.  The MBHO must then develop a means of tracking and adjusting provider reimbursement models across all plans.  Again, there is

no existing IT solution for this problem.  Anderson Dec. ¶¶ 18-20; *see also* Miller Dec. ¶¶ 5-6; McGreal Dec. ¶ 10.

The IFR enforcement date is April 5, 2010.   Had they simply engaged in a public dialogue through traditional notice and comment rulemaking, the Departments would quickly have learned that these provisions are not only unreasonably onerous and ambiguous, they are unnecessary to achieve the Congressional parity goals shared by the Departments and Coalition members.

The imminence and irreparable nature of these harms justifies the issuance of a TRO and preliminary injunction.  Indeed, the unrecoverable and massive costs associated with attempting to comply with the ambiguous and far reaching IFR by itself constitutes irreparable harm.  *See, e.g., Ledbetter v. Baldwin*, 479 U.S. 1309, 1310 (1986) (holding that where state would have to incur administrative costs of changing its child-support payment plan system to conform to a district court order, and such costs would not be recoverable if the order was ultimately reversed, a showing of irreparable harm was made that justified a stay of the district court order) (Powell, J., as Circuit Justice); *LG Elecs., U.S.A., Inc. v. Dep't of Energy*, No. 09-2297, 2010 WL 151983, at *13 (D.C. Cir. Jan. 18, 2010) ("unrecoverable financial loss can constitute irreparable injury" where the injured party cannot recoup monetary damages from a federal agency); *Chamber of Commerce of the U.S. v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010) ("Imposition of monetary damages [resulting from compliance with improper regulation] that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury.").[8]  Moreover,

_____

[8] The irreparable harm associated with significant financial expenditures under the IFR is not the result merely of the need to comply with federal regulations.  If the regulations were properly promulgated, the Coalition understands that the cost of compliance would simply be a cost of

[Footnote continued on next page]

33

the confusion engendered by the IFR's ambiguity and the corresponding uncertainty over what is required to comply, and which business practices must be modified, is evidence of irreparable harm. *See Tafas v. Dudas*, 511 F. Supp. 2d 652, 669 (E.D. Va. 2007) (uncertainty about how to comply with new rules coupled with substantial cost of implementing potentially invalid regulations constitutes irreparable harm). The only means of preventing this harm is for the Court to issue the TRO and a preliminary injunction.

### III.

### ON BALANCE, THE EQUITIES FAVOR GRANTING THE TRO AND PRELIMINARY INJUNCTION.

The very real, imminent, and irreparable harms that the Coalition faces outweigh any concerns that the Defendants have with further delay in their rulemaking. The notion that the IFR must become effective on April 5, 2010 lest "some members of the regulated community may not know what steps to take to comply with the requirements of MHPAEA" (75 Fed. Reg. at 5419) is not credible. The Defendants had ample time – since October 3, 2008 – to engage in a robust notice-and-comment rulemaking process, and they simply abdicated their responsibilities, failing even to meet the one-year deadline mandated by Congress. Moreover, the MHPAEA is already in effect: it took effect at the beginning of October 2009. Thus, the Departments' purported concern with the regulated community's ability to comply with the law absent a regulatory overlay is disingenuous – the regulated community is already doing as much.

---

[Footnote continued from previous page]
doing business. Because the regulations were *not* properly promulgated, the harm stems from the fact that the costs of compliance may be for naught, whether in whole or in part. It is the *needless* expenditure of time and money that gives rise to the type of irreparable harm warranting an injunction. *See, e.g.*, *Ledbetter, supra*; *Tafas v. Dudas*, 511 F. Supp. 2d 652, 669 (E.D. Va. 2007) (granting preliminary injunction in part on the basis that pharmaceutical company would otherwise incur financial losses and compliance costs that it could not recover if the challenged regulation were subsequently held to be invalid).

Affording more time to permit public comment is far more important than providing guidance immediately – there is no emergency. *See Nat'l Women*, 416 F. Supp. 2d at 107 (stating that the need to provide guidance cannot, on its own, outweigh the requirement to abide by the APA's notice-and-comment requirements).

For the same reason, the Defendants' purported concern with the downstream impact of the regulated community's confusion on healthcare plan participants and beneficiaries is overstated. The IFR has created and compounded confusion, not reduced it. What is needed is not a set of unnecessarily onerous, uninformed and overly expansive regulations that have not been subjected to public scrutiny and critique and agency revision, but just the opposite. In an area as complex and important as healthcare parity, regulations will only work well if they are the product of deliberative, reasoned decision-making. *See Analysas Corp.*, 827 F. Supp. at 25 (stating that "the *more* important the rule..., the *more* the need for public participation in its formulation") (emphasis in original). That deliberative process simply did not take place here.

### IV.

### A TRO AND INJUNCTION ARE IN THE PUBLIC INTEREST.

For the same reason the good cause exception to notice-and-comment rulemaking is not applicable to the IFR, the public interest is served when federal agencies comply with their legal obligations, including the procedural obligations imposed on them by the APA. *See N. Mariana Islands*, 2009 WL 4070877, at *10 ("The public interest is served when administrative agencies comply with their obligations under the APA."). As the D.C. Circuit has stated: "It is now commonplace that notice-and-comment rule-making is a primary method of assuring that an agency's decisions will be informed and responsive." *New Jersey v. EPA*, 626 F.2d at 1045; *accord Cresote Council v. Johnson*, 555 F. Supp. 2d 36, 40 (D.D.C. 2008) (noting "general

public interest in open and accountable agency decision-making").   Beyond the axiomatic legal principle that it is in the public's interest for its federal agencies to abide by the law is the simple observation that, in a case such as this, it just makes good sense for the Defendants to engage the interested public in the rulemaking process.

Moreover, the IFR directly impacts  patient care.  As discussed above, the unified deductible requirement and the nonquantitative treatment limitation provisions erect barriers to access and prohibit utilization management tools critical to ensuring appropriate treatment. Surely, the public is not well served by regulations of such import that have not been subject to public scrutiny.

## CONCLUSION

For the reasons given, the Coalition requests that its request for a TRO be granted, that a preliminary injunction be granted barring enforcement of the IFR, and that the IFR be vacated and remanded to the respective agency Defendants for further consideration, after opportunity for public notice and comment.

April 1, 2010

Respectfully submitted,

Jeffrey L. Poston (D.C. Bar No. 426178)
Christopher Flynn (D.C. Bar No. 446235)
William J. Flanagan (D.C. Bar No. 311035)
April N. Ross (D.C. Bar No. 500488)
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
(202) 624-2500 (phone)
(202) 628-5116 (fax)

*Counsel for Plaintiff*

36